IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

APR 2 3 2008

FILED

JN

APR 2 3 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| FEDERAL TRADE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civ. No. |
| ) | |
| 6554962 CANADA INC., a corporation, ) | 08CV2309 |
| also d/b/a UNION CONSUMER ) | JUDGE ASPEN |
| BENEFITS, and ) | MAG. JUDGE ASHMAN |
| ) | |
| NAEEM ALVI, individually and as an ) | |
| officer and director of the corporate ) | |
| defendant, ) | |
| ) | |
| Defendants. ) | |

FEDERAL TRADE COMMISSION'S MEMORANDUM IN SUPPORT OF
ITS *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER
WITH ASSET FREEZE, OTHER EQUITABLE RELIEF, AND ORDER TO
SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

## I.  INTRODUCTION

This case involves a fraudulent telemarketing scheme operating out of Montreal that targets senior citizens across the United States -- and charges them $399 for a worthless medical discount package. The defendants' scheme is simple. Their telemarketing calls have one purpose – to get consumers' bank account numbers so they can run unsigned "preauthorized" checks through consumers' accounts.

To get the account numbers, defendants use a variety of deceptive ploys. In some cases, they pretend to be calling from, or about, government programs like Social Security or Medicare, or from consumers' banks. In other cases, they claim to be offering large discounts on medical services and prescriptions. In truth, defendants have no connection to any legitimate program or bank, and they cannot provide the promised discounts.

Once they get consumers' account information, defendants immediately withdraw $399.

Many consumers are caught off guard by the withdrawals because they never agreed to buy anything. They only discover the debits when reviewing their monthly statements, or when their checks start bouncing. About half of defendants' checks are returned unpaid by consumers' banks. But defendants deal in volume, aggressively calling consumers in every state, often calling the same consumers repeatedly, and successfully debit enough accounts to profit handsomely from their scheme. Since starting operations in late 2006, defendants likely have taken in well over $1 million.

After taking consumers' money, defendants send consumers a package containing a discount prescription drug card that supposedly provides substantial savings on prescriptions at numerous "participating pharmacies" including Target, Wal-Mart and other major stores. Printed on the card are the logo and toll-free telephone number of BioScrip, a pharmacy discounter based in New York, but this is without authorization, and defendants have no business relationship with BioScrip. Also printed on the card are instructions for pharmacists to enter a "BIN" code to process transactions, but the "BIN" code is fake. Pharmacy employees at Target and other stores confirm that it does not work.

Defendants operate their scheme in complete defiance of the Do Not Call rules promulgated by the Commission (in the Telemarketing Sales Rule) to give consumers the option of avoiding most telemarketing calls. Defendants have never accessed the National Do Not Call Registry to check their calling lists. In fact, the evidence indicates that about 20 percent of defendants' sales are made to consumers whose telephone numbers are on the Registry, including many elderly and vulnerable consumers.

The Federal Trade Commission asks that the Court bring an immediate halt to this blatantly unlawful scheme, which violates Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and numerous provisions of the Telemarketing Sales Rule, 16 C.F.R. Part 310. The Commission seeks a temporary restraining order ("TRO") that would immediately halt defendants' scheme and preserve defendants' assets for eventual restitution to victims. The Commission's request is supported by substantial evidence establishing defendants' fraud, including declarations from twenty consumer victims, two witnesses from the pharmacy industry, and two FTC investigators. Taken together, this evidence leaves no doubt that the Commission is likely to succeed on the merits of its claims.

2

## II.   THE PARTIES

### A.   The Federal Trade Commission

The Federal Trade Commission ("FTC" or "Commission") is an independent agency created by the FTC Act, 15 U.S.C. §§ 41-58.  The Commission enforces, *inter alia,* Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce, and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing practices.  The Commission is authorized to initiate proceedings in federal court to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including restitution and the disgorgement of ill-gotten gains.  15 U.S.C. § 53(b).

### B.   The Defendants

Defendant 6554962 Canada Inc., d/b/a Union Consumer Benefits ("UCB"), was incorporated in Canada on April 18, 2006.[1]  Its official registered address in Montreal belongs to an auto repair shop.[2]  The call center from which it actually operates is located elsewhere in the same city.[3]  Its U.S. address – the only address that it reveals to U.S. consumers – is a P.O. box just south of the border in Plattsburgh, New York.[4]

Defendant Naeem Alvi ("Alvi") is a resident of Quebec.[5]  Alvi is the sole owner, director and officer of UCB.[6]  As described further below, Alvi directs, controls and participates in the

---

[1]   Plaintiff's Exhibit ("PX") 23, Long Dec., Att. A.

[2]   *Id.,* ¶ 6 & Atts. E and F.

[3]   *Id.,* Att. L, Bates-labeled page Banctech 000028 (street address listed in application for payment processing).

[4]   *Id.,* ¶ 7 & Atts. G and H; *see, e.g.,* PX 16, O'Toole Dec., Atts. B and C; PX 20, Whittemore Dec., Atts B and C.  Defendants' telemarketers falsely claim that UCB is located in New York.  *See. e.g.,* PX 14, Markham Dec., ¶ 3.

[5]   PX 23, Long Dec., Att. B (Item 4).

[6]   *Id.,* Atts. B and D (identifying Alvi as director), and Att. L, Bates-labeled page Banctech 000028 (identifying Alvi as President and 100% owner).

3

unlawful operations of UCB.[7]

## III.   JURISDICTION AND VENUE

The Court has subject matter jurisdiction over the FTC's claims pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c), and 6105(b). Personal jurisdiction over the defendants is established pursuant to the FTC Act's nationwide service of process provision. *See* 15 U.S.C. § 53(b). Where a federal statute provides for nationwide service of process, "personal jurisdiction may be obtained over any defendant having minimum contacts with the United States as a whole." *FTC v. Bay Area Business Council, Inc.*, No. 02 C 5762, 2003 WL 1220245, at *2 (N.D. Ill. March 14, 2003).

Venue is proper in the Northern District of Illinois. The defendants, a Canadian corporation, and its principal, a resident of Quebec, are subject to venue in any district. *See* 28 U.S.C. § 1391(d).

## IV.   DEFENDANTS' UNLAWFUL BUSINESS PRACTICES

Since at least 2006, defendants have been calling elderly consumers in the United States and tricking them into revealing their bank account information.[8] Defendants have no legitimate business, and no real product to sell, so they often avoid making any sales pitch. Instead, they pretend they are calling about government benefit programs, such as Social Security or Medicare, or consumers' bank accounts.[9] They claim they need consumers' account information in order to send them a new ID number, or a new card, or to protect them from fraud.[10]

---

[7] *See id.*, Atts. A through E (corporate papers), and Atts. J and L (payment processor documents signed by Alvi), and Att. N (emails to and from Alvi).

[8] The evidence strongly suggests that defendants are targeting elderly consumers – in particular, defendants' references to Social Security and Medicare, and the fact that the consumer victims identified in the FTC's exhibits have an average age of 79. *See* PX 1-20. Only one is younger than 72. *See* PX 12, Hubbard Dec., ¶ 1 (age 46).

[9] PX 1, Bolerjack Dec., ¶¶ 6-7; PX 3, Bugdal Dec., ¶ 5; PX 7, Elliott Dec., ¶¶ 1-3; PX 10, Haggard Dec., ¶ 5; PX 17, Searcy Dec., ¶ 3; PX 20, Whittemore Dec., ¶ 9; *see also* PX 2, Bormann Dec., ¶ 4; PX 18, Swagler Dec., ¶¶ 4, 14. In many of these cases, due to UCB's failure to deliver an honest sales pitch identifying itself and its product, consumers have difficulty identifying the specific telephone call (if any) that led to UCB's $399 charge.

[10] PX 1, Bolerjack Dec., ¶ 7; PX 2, Bormann Dec., ¶¶ 5-6; PX 7, Elliott Dec., ¶¶ 1-3; PX 10, Haggard Dec., ¶ 5; PX 12, Hubbard Dec., ¶¶ 4-5.

Sometimes they imply they already have the account information, and just want the consumer to "verify" it.[11]  They call repeatedly, and call back even when consumers ask them to stop.[12]  They badger and confuse consumers until they get what they want.[13]

This side of defendants' business essentially amounts to a "phishing" scam.  Their motive is to get consumers' bank account information by any possible means; and once they get it, they withdraw $399, usually with an unsigned "preauthorized" check, also known as a "demand draft," payable to UCB.[14]  Consumers only discover the withdrawals when their bank statement arrives, or, worse, when their account is overdrawn and their checks start bouncing.[15]  In such cases, consumers have no idea who or what UCB is, or why it has taken their money.[16]  Many consumers close their bank accounts to prevent it from happening again.[17]

The experience of Catherine Bugdal, an 86 year-old retiree from New Jersey, is typical.  Ms. Bugdal learned that UCB had withdrawn $399 from her bank account on May 2, 2007 with a "preauthorized" check.[18]  Although this is a "fairly significant expense" that she "would be likely to remember," Ms. Bugdal has no memory of dealing with UCB, or authorizing the $399 debit,

---

[11]  PX 12, Hubbard Dec., ¶¶ 3, 9; PX 14, Markham Dec., ¶ 4; *see also* PX 2, Bormann Dec., ¶ 3.

[12]  PX 12, Hubbard Dec., ¶¶ 5-8; PX 14, Markham Dec., ¶¶ 3-6.

[13]  PX 1, Bolerjack Dec., ¶¶ 5-10; PX 2, Bormann Dec., ¶¶ 3-6; PX 3, Bugdal Dec., ¶ 5; PX 4, Coram Dec., ¶¶ 3-6; PX 12, Hubbard Dec., ¶¶ 3-9; PX 15, Ohlsen Dec., ¶ 6; PX 17, Searcy Dec., ¶¶ 3-4; PX 20, Whittemore Dec., ¶ 9; *see also* PX 7, Elliott Dec., ¶¶ 1-3; PX 14, Markham Dec., ¶¶ 3-7.

[14]  PX 1, Bolerjack Dec., Att. A; PX 3, Bugdal Dec., Att. A; PX 4, Coram Dec., Att. A; PX 6, Dorame Dec., Att. D; PX 8, Feito Dec., Att. A; PX 9, Greene Dec., Att. A; PX 10, Haggard Dec., Att. A; PX 11, Howard Dec., Att. A; PX 13, Klein Dec., Att. A; PX 15, Ohlsen Dec., Att. A; PX 16, O'Toole Dec., Att. A; PX 17, Searcy Dec., Att. A; PX 18, Swagler Dec., Att. B; PX 19, Tortella Dec., Att. B; PX 20, Whittemore Dec., Att. A.

[15]  PX 4, Coram Dec., ¶ 4; PX 10, Haggard Dec., ¶ 3; PX 11, Howard Dec., ¶ 7; PX 15, Ohlsen Dec., ¶¶ 4-5; PX 16, O'Toole Dec., ¶ 3; PX 17, Searcy Dec., ¶ 6; PX 20, Whittemore Dec., ¶ 3.

[16]  PX 3, Bugdal Dec., ¶ 4; PX 4, Coram Dec., ¶ 4; PX 6, Dorame Dec., ¶ 13 & Atts. H and I; PX 8, Feito Dec., ¶ 5; PX 10, Haggard Dec., ¶¶ 3-6; PX 11, Howard Dec., ¶ 7; PX 13, Klein Dec., ¶¶ 3, 5; PX 15, Ohlsen Dec., ¶ 5; PX 16, O'Toole Dec., ¶ 3; PX 20, Whittemore Dec., ¶¶ 4, 9.

[17]  PX 1, Bolerjack Dec., ¶ 11; PX 4, Coram Dec., ¶ 8; PX 9, Greene Dec., ¶ 4; PX 11, Howard Dec., ¶ 10; PX 18, Swagler Dec., ¶ 15; PX 20, Whittemore Dec., ¶ 4.

[18]  PX 3, Bugdal Dec., ¶ 3 & Att. A.

or receiving any goods or services in return.[19]  Moreover, she has no interest in, or need for, the type of discounts that UCB supposedly offers.[20]  Ms. Bugdal suspects UCB got her account information during an "odd" telephone call from someone calling about her bank account – a standard "phishing" tactic.[21]

This conduct may fairly be described as stealing – and it is not an isolated part of defendants' business.  In fact, over the ten month period from November 10, 2006 through August 6, 2007, about 46 percent of defendants' demand drafts were returned unpaid by consumers' banks, with 871 of those demand drafts, totaling $347,529, specifically designated as "unauthorized."[22]  In one case, defendants were caught red-handed taking $399 from the account of a consumer who had died three months earlier.[23]  This and other evidence suggests that UCB sometimes debits consumers' accounts without even calling them, perhaps by acquiring the account information from other scam companies.[24]

In other cases, defendants' telemarketers deliver a recognizable sales pitch – but the sales pitch is fraudulent.  The telemarketers offer consumers substantial discounts on medical services and prescriptions.[25]  They tell consumers, or lead them to believe, that what they are offering is supplemental insurance, or that UCB is somehow connected to the Medicare Part D prescription

---

[19]  *Id.*, ¶ 4.

[20]  *Id.*, ¶ 6.

[21]  *Id.*, ¶ 5.

[22]  PX 23, Long Dec., ¶¶ 10, 12 & Att. K.

[23]  PX 9, Greene Dec., ¶¶ 3-4 & Att. A; PX 23, Long Dec., Att. N, Bates-labeled pages Banctech 001730 and 002424 (related emails).

[24]  *Id.*; PX 6, Dorame Dec., ¶¶ 13-14; PX 18, Swagler Dec., ¶¶ 13-14; PX 19, Searcy Dec., ¶ 7.

[25]  PX 5, Davis Dec., ¶ 3; PX 11, Howard Dec., ¶¶ 3-4; PX 17, Searcy Dec., ¶ 3; *see also* PX 23, Long Dec., Att. L, Bates-labeled page Banctech 000028 (UCB's payment processing application describes its product as "medical & prescription discounts").

drug program.[26]  Sometimes defendants disclose their "one-time fee,"[27] but sometimes they claim the program is free,[28] or that consumers will not be charged until they have a chance to review the details in writing.[29]

In fact, consumers are charged $399 immediately, and must wait, sometimes for months, to receive defendants' package in the mail (although some never receive it).[30]  If and when the package arrives, consumers find that its only contents are an unsigned cover letter from "UCB Management," and a "Welcome Kit" from another company called Pharmabay.net.[31]  The "Welcome Kit" consists of brochures touting the Pharmabay.net website, accessible to any member of the public for free, where consumers supposedly can order drugs from Canada.[32] Also enclosed is a Pharmabay.net membership card, supposedly entitling consumers to substantial discounts on prescriptions at a lengthy list of  "participating pharmacies" in the United States.[33]  The package contains nothing relating to discounts on actual medical services; and a disclaimer on the card states: "This plan is not insurance."[34]

---

[26] PX 14, Markham Dec., ¶ 3 & Att. A; PX 16, O'Toole Dec., ¶ 11; PX 17, Searcy Dec., ¶¶ 3-4; see also PX 19, Tortella Dec., ¶¶ 3-4, 7.

[27] PX 11, Howard Dec., ¶ 4; see also PX 17, Searcy Dec., ¶ 3.

[28] PX 12, Hubbard Dec., ¶¶ 3, 7; PX 17, Searcy Dec., ¶ 3.

[29] PX 5, Davis Dec., ¶¶ 3-4.

[30] PX 5, Davis Dec., ¶ 6 (3 months); PX 20, Whittemore Dec., ¶¶  3, 5 (1-2 months); PX 3, Bugdal Dec., ¶ 4 (never); PX 10, Haggard Dec., ¶ 8 (never); PX 13, Klein Dec., ¶ 5 (never); PX 15, Ohlsen Dec., ¶ 10 (never); PX 19, Tortella Dec., ¶ 11 (never).

[31] PX 6, Dorame Dec., ¶ 16 & Atts. E and F; PX 16, O'Toole Dec., ¶¶ 6-7 & Atts. C and D; PX 20, Whittemore Dec., ¶¶ 6-7 & Atts. C and D.

[32] See PX 6, Dorame Dec., Att. F, pp. 6-8; see also PX 16, O'Toole Dec., Att. D; PX 20, Whittemore Dec., Att. D.  It appears the Pharmabay.net website may be phony.  On February 15, 2008, an FTC investigator accessed the website and successfully placed an undercover order for two drugs, but, to date, has received nothing from the company.  PX 24, Vera Dec., ¶¶ 3-5 & Atts. 1 and 2.

[33] PX 6, Dorame Dec., ¶ 16 & Att. F, pp. 4-5; see also PX 16, O'Toole Dec., Att. D; PX 20, Whittemore Dec., Att. D.

[34] PX 6, Dorame Dec., Att. F, p. 5; see also PX 16, O'Toole Dec., Att. D; PX 20, Whittemore Dec., Att. D.

The Pharmabay.net membership card is counterfeit and utterly worthless. The face of the card contains a "Scrip Solutions" logo and toll-free telephone number that are the property of BioScrip, Inc., a pharmacy discounter based in Elmsford, New York. However, the logo and telephone number appear on the Pharmabay.net card without BioScrip's authorization, and BioScrip has demanded that Pharmabay.net stop using these identifiers.[35] Moreover, the card does not work. The card instructs pharmacists to enter a "BIN" number -- 90020 -- but employees at three of the claimed "participating pharmacies" -- Target, Dominick's, and Giant Eagle -- have confirmed that this BIN number is a fake, and consequently the Pharmabay.net card cannot provide any discounts.[36]

Consumers who seek refunds from UCB encounter delays and excuses, and usually wind up with nothing. The company's representatives insist that consumers first return the worthless package, a transparent attempt to buy time and prevent consumers from reversing the charges through their banks, which typically cannot be done after a certain date.[37] Further delays result when returned packages come back to consumers unclaimed, or UCB representatives deny receiving them back.[38] UCB representatives often claim falsely that a refund is on the way, or is being delayed due to bad weather or "frozen" funds.[39] Even after complaining repeatedly to UCB, and returning its package, many consumers never receive a refund.[40]

Defendants have carried out this scheme in complete defiance of the Do Not Call rules in the Telemarketing Sales Rule, which require sellers and telemarketers to check their calling lists against the National Do Not Call Registry ("Registry"), and prohibit them from calling

---

[35] PX 21, Frankel Dec., ¶¶ 3-8 & Atts. A, B and C.

[36] PX 6, Dorame Dec., Att. F, pp. 4-5; PX 22, Meshanski Dec., ¶¶ 4-13 & Att. A; PX 23, Long Dec., ¶¶ 24-28 & Atts. O and P.

[37] PX 4, Coram Dec., ¶ 5; PX 17, Searcy Dec., ¶ 7; PX 18, Swagler Dec., ¶ 13; *see* PX 6, Dorame Dec., ¶ 10.

[38] PX 6, Dorame Dec., ¶ 19 & Att. J; PX 18, Swagler Dec., ¶ 13.

[39] PX 5, Davis Dec., ¶ 7; PX 6, Dorame Dec., ¶¶ 15, 19; PX 15, Ohlsen Dec., ¶¶ 7-8.

[40] PX 5, Davis Dec., ¶¶ 7-9; PX 17, Searcy Dec., ¶¶ 9-12; PX 18, Swagler Dec., ¶¶ 12-14; *see also* PX 15, Ohlsen Dec., ¶¶ 7-10 (never got package, but still got no refund).

consumers whose telephone numbers are listed on the Registry.[41]  Defendants have called consumers in every state and the District of Columbia without ever accessing the Registry and paying the required fees.[42]  Moreover, evidence obtained from their payment processor shows that, between November 2006 and August 2007, about 20 percent of their sales were made to consumers they were not permitted to call.[43]

Through these unlawful practices, defendants have likely taken in well over a million dollars.[44]  They no doubt will continue defrauding vulnerable consumers unless restrained and enjoined by this Court.

## V.   ARGUMENT

The Commission seeks injunctive relief to prevent defendants from continuing to violate the law while the case is pending.  We ask that the Court also freeze defendants' assets to preserve them for restitution to victims.  The Court has full authority to enter the requested relief, which is strongly supported by the evidence.

### A.   The Court has Authority to Grant the Requested Relief.

The FTC Act provides that "in proper cases the Commission may seek, and after proper proof, the court may issue a permanent injunction."  15 U.S.C. § 53(b).  The practice of defrauding consumers by misrepresenting or omitting material facts presents a "proper case" for injunctive relief under 15 U.S.C. § 53(b).  *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1028 (7th Cir. 1988); *see also FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005).  Under that section, the full breadth of the court's authority is available, including the power to grant such ancillary final relief as rescission of contracts and restitution.

---

[41]  PX 23, Long Dec., ¶¶ 14-17; *see* 16 C.F.R. §§ 310.4 and 310.8.

[42]  *Id.*, ¶¶ 12(b), 18.

[43]  *Id.*, ¶¶ 19-23; *see, e.g.*, PX 6, Dorame Dec., ¶ 3; PX 13, Klein Dec., ¶ 5; PX 18, Swagler Dec., ¶¶ 3, 14.

[44]  Records obtained from Banctech, UCB's payment processor from November 2006 through August 2007, show that, despite a 46% return rate, UCB successfully debited consumers' accounts for at least $732,564 through August 6, 2007.  PX 23, Long Dec., Att. K.  UCB has continued operating since August 2007, apparently using both demand drafts and electronic debits, and presumably has added considerably to its ill-gotten gains.  *See, e.g.*, PX 4, Coram Dec., Att. A; PX 5, Davis Dec., Att. A; PX 11, Howard Dec., Att. A; PX 15, Ohlsen Dec., Att. A; PX 17, Searcy Dec., Att. A.

*FTC v. Febre,* 128 F.3d 530, 534 (7th Cir. 1997); *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 571-72 (7th Cir.), *cert. denied,* 493 U.S. 954 (1989). The court may also enter whatever preliminary relief is necessary to preserve the possibility of providing effective final relief, including an order freezing assets for eventual restitution to victims. *World Travel,* 861 F.2d at 1026, 1031; *see also Amy Travel,* 875 F.2d at 571.

> **B.    The Commission Meets the Applicable Legal Standard for Issuance of a Temporary Restraining Order and Preliminary Injunction.**

To grant preliminary injunctive relief in an FTC Act case, the district court "'must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities.'" *World Travel,* 861 F.2d at 1029 (quoting *FTC v. Warner Communications, Inc.,* 742 F.2d 1156, 1160 (9th Cir. 1984)); *see also FTC v. Datacom Mktg. Inc.,* No. 06 C 2574, 2006 U.S. Dist. LEXIS 33029, at *10-11 (N.D. Ill. May 24, 2006) (Holderman, C.J.). Under this "public interest" test, "it is not necessary for the FTC to demonstrate irreparable injury." *World Travel,* 861 F.2d at 1029. Unlike a private litigant, moreover, who generally must show a strong or substantial likelihood of success, the Commission need only make the statutory showing of a likelihood of ultimate success. *Id.* And when the court balances the equities, the public interest "must receive far greater weight" than any private concerns. *Id.* Preliminary injunctive relief is therefore appropriate if the Commission shows a likelihood of success on the merits and that a balancing of the equities, giving greater weight to the public interest, favors such relief.

> **1.    FTC Act Violations – Counts I and II**

Defendants' activities clearly qualify as deceptive acts or practices under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances. *See Bay Area Business Council,* 423 F.3d at 635; *FTC v. World Media Brokers,* 415 F.3d 758, 763 (7th Cir. 2005); *World Travel,* 861 F.2d at 1029. The materiality requirement is satisfied if the misrepresentation or omission involves information that is likely to affect a consumer's choice of, or conduct regarding, a product or service. *Kraft, Inc. v. FTC,* 970 F.2d 311, 322 (7th Cir. 1992), *cert. denied,* 507 U.S. 909 (1993); *Datacom Mktg.,* 2006 U.S. Dist. LEXIS 33029, at *13.

In this case, defendants have violated the FTC Act by misrepresenting who they are and what they can provide to consumers. As described above, the defendants frequently misrepresent that they are calling from, or about, government benefit programs, or from consumers' banks. In this way, they persuade consumers to divulge their bank account information so they can withdraw $399. Defendants also falsely claim that they can provide consumers with substantial discounts on medical services and prescriptions. In fact, defendants send consumers a discount prescription card that is counterfeit and does not work.

### 2. Telemarketing Sales Rule Violations

The Commission promulgated (and subsequently amended) the TSR to outlaw certain deceptive and abusive telemarketing practices that have been a recurring threat to consumers over time. The TSR provides specific measures designed to protect consumers from deceptive practices and to help ensure that they have sufficient information to make informed purchasing decisions. In this case there has been a wholesale failure to comply with these straightforward requirements. These law violations amply demonstrate the predatory and lawless nature of the defendants' operation.

#### a. Count III – 16 C.F.R. § 310.3(a)(2)(iii)

The TSR prohibits sellers and telemarketers from misrepresenting any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(iii). Defendants violate this provision by misrepresenting that they can provide consumers with substantial discounts on medical services and prescriptions.

#### b. Count IV – 16 C.F.R. § 310.3(a)(2)(vii)

The TSR also prohibits sellers and telemarketers from misrepresenting their affiliation with, or endorsement or sponsorship by, any person or government entity. 16 C.F.R. § 310.3(a)(2)(vii). Defendants violate this provision by misrepresenting that they are calling from, on behalf of, or are otherwise affiliated with government programs, such as Medicare or Social Security, or consumers' banks.

#### c. Count V – 16 C.F.R. § 310.4(a)(6)

The TSR also prohibits seller and telemarketers from causing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the

11

consumer. 16 C.F.R. § 310.4(a)(6). Defendants violate this provision by debiting funds from consumers' bank accounts without authorization.

### d.    Count VI – 16 C.F.R. § 310.4(d)

The TSR also prohibits a telemarketer, in an outbound telephone call to induce the purchase of goods or services, from failing to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call: (1) the identity of the seller; (2) that the purpose of the call is to sell goods or services; and (3) the nature of the goods or services. 16 C.F.R. § 310.4(d). Defendants do the opposite, using various tricks to acquire consumers' account information without disclosing that they intend to withdraw funds. Defendants often fail to identify themselves, and the purpose of their calls, and never truthfully describe the nature of their goods or services.

### e.    Count VII – 16 C.F.R. § 310.4(b)(1)(iii)(B)

The TSR also prohibits sellers and telemarketers from calling consumers whose telephone numbers are on the National Do Not Call Registry. 16 C.F.R. § 310.4(b)(1)(iii)(B). The defendants routinely violate this provision.

### f.    Count VIII – 16 C.F.R. § 310.8

The TRS also prohibits sellers and telemarketers from calling telephone numbers within a given area code without first paying the required fee for access to the telephone numbers within that area code that are included in the Registry. 16 C.F.R. § 310.8. Defendants are calling consumers throughout the United States in violation of this provision.

### 3.    The Equities Tip Decidedly in the Commission's Favor.

Once the Commission has shown a likelihood of success on the merits, the Court must balance the equities, assigning greater weight to the public interest than to any of defendants' private concerns. *World Travel,* 861 F.2d at 1029. The public equities in this case are compelling, as the public has a strong interest in halting the deceptive scheme, and in preserving the assets necessary to provide effective final relief to victims. *See FTC v. Sabal,* 32 F. Supp. 2d 1004, 1009 (N.D. Ill. 1998); *Datacom Mktg.,* 2006 U.S. Dist. LEXIS 33029, at *16. Defendants, by contrast, have no legitimate interest in continuing to deceive elderly U.S. consumers, debit funds from consumers' accounts without authorization, and ignore the National Do Not Call Registry. *See Sabal,* 32 F. Supp. 2d at 1009. An injunction is required to ensure that

12

defendants' scheme does not continue while the case is pending.

### 4.    Naeem Alvi is Individually Liable.

Defendant Naeem Alvi is the perpetrator of this illicit scheme and is individually liable for the violations of the FTC Act and TSR described above. An individual may be held liable for corporate practices where he or she (1) participated directly in or had authority to control the acts or practices; and (2) knew or should have known about those practices. *World Media Brokers,* 415 F.3d at 764; *see also Bay Area Business Council,* 423 F.3d at 636; *Amy Travel,* 875 F.2d at 573-74. Authority to control can be evidenced by "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Amy Travel,* 875 F.2d at 573. The Commission need not show intent to defraud. *Id.* at 573-74. Instead, the knowledge requirement may be satisfied by a showing that the individual (1) had actual knowledge of the deceptive acts or practices, (2) was recklessly indifferent to the truth or falsity of the representations, or (3) had an awareness of a high probability of fraud coupled with an intentional avoidance of the truth. *Bay Area Business Council,* 423 F.3d at 636; *World Media Brokers,* 415 F.3d at 764. The "degree of participation in business affairs is probative of knowledge." *Amy Travel,* 875 F.2d at 574.

Alvi incorporated UCB.[45] He is the corporation's sole owner and director, and has held himself out as its "President."[46] He signed the application and agreement for payment processing that enabled UCB to debit consumers' bank accounts.[47] Moreover, email correspondence included in the FTC's exhibits shows that Alvi personally forwarded sales to the payment processor, and used the proceeds of those sales to pay his own salary and employee payroll.[48] The emails also show that Alvi personally handled consumer complaints.[49] He clearly

---

[45] PX 23, Long Dec., Att. A (Articles of Incorporation, Item 8).

[46] *Id.*, Atts. B and D, and Att. J, Bates-labeled page Banctech 000010, and Att. L, Bates-labeled page Banctech 000028.

[47] *Id.*, Att. L, Bates-labeled pages Banctech 000030 and 000034.

[48] *Id.*, Att. N, Bates-labeled pages Banctech 001844, 001856, 002553, 002534, 002485, 002448, 002418, 002396, 002356, and 002348.

[49] *Id.*, Att. N, Bates-labeled pages Banctech 001730, 002424, 002394, 002370, 002344, and 001255.

13

meets the standard for individual liability.

### 5.     An Asset Freeze is Necessary and Appropriate.

Part of the relief sought by the Commission is restitution for the victims of defendants' fraud. To preserve the possibility for such relief, the Commission seeks a freeze of defendants' assets to prevent concealment or dissipation of assets while the case is pending. The Court's jurisdiction over foreign assets is well established. Once the Court has jurisdiction over a party, the Court "has authority to order it to 'freeze' property under its control, whether the property be within or without the United States." *U.S. v. First Nat'l City Bank,* 379 U.S. 378, 384 (1965). An asset freeze is appropriate once the Court determines that the Commission is likely to prevail on the merits and that restitution would be an appropriate final remedy. *See World Travel,* 861 F.2d at 1031 & n.9. In the words of the Seventh Circuit, the district court at that juncture has "a duty" to ensure that defendants' assets are "available to make restitution to the injured consumers." *Id.* at 1031. The asset freeze should extend to individual assets as well because the Commission is likely to succeed in showing that the individual defendant also is liable for restitution. *Id.* (affirming freeze on individual assets); *see also Datacom Mktg.,* 2006 U.S. Dist. LEXIS 33029, at *16-17 (freezing assets of individual and corporate defendants).

### 6.     The Temporary Restraining Order Should Be Issued *Ex Parte*.

To prevent defendants from dissipating or concealing their assets, the requested TRO should be issued *ex parte*.[50] An *ex parte* TRO is warranted where the facts show that irreparable injury, loss, or damage will result before the defendants can be heard in opposition. *See* Fed. R. Civ. P. 65(b).[51] The utterly fraudulent nature of defendants' scheme, coupled with rampant unauthorized billing, their attempts to conceal their true location in Montreal, and their treatment of consumers seeking refunds, indicates that defendants likely would conceal or dissipate assets if notified of the Commission's motion. Moreover, the evidence shows that defendants have

---

[50] *See* Declaration in Support of *Ex Parte* Motion for Temporary Restraining Order and Application to File Papers Under Seal (describing need for *ex parte* relief here and citing cases in which defendants who learned of impending FTC action withdrew funds, destroyed vital documents, and fled the jurisdiction).

[51] The FTC has submitted a proposed Temporary Restraining Order with its papers.

used banks and payment processors in the United States[52] – if notified, defendants may immediately transfer funds to locations outside the United States.  In other FTC cases, courts in this district have consistently granted restraining orders on an *ex parte* basis under similar circumstances.[53]

## VI.    CONCLUSION

For the foregoing reasons, the Federal Trade Commission respectfully requests that this Court enter the proposed Temporary Restraining Order *Ex Parte* and issue an Order to Show Cause Why a Preliminary Injunction Should Not Issue.

Respectfully submitted,

WILLIAM BLUMENTHAL
General Counsel

Dated: April 23, 2008.

GUY G. WARD
Federal Trade Commission
55 West Monroe Street, Suite 1825
Chicago, Illinois 60603
(312) 960-5634 [telephone]
(312) 960-5600 [facsimile]

Attorney for Plaintiff
FEDERAL TRADE COMMISSION

---

[52] *See, e.g.*, PX 23, Long Dec., ¶¶ 8-13 (Banctech Processors, Inc., in Texas) & Att. J, Bates-labeled page Banctech 000011 (Wachovia Bank in New Jersey).

[53] *See, e.g., FTC v. 1522838 Ontario Inc.*, No. 06 C 5378 (N.D. Ill. Oct. 4, 2006) (Gettleman, J.); *FTC v. Datacom Mktg.*, No. 06 C 2574 (N.D. Ill. May 9, 2006) (Holderman, C.J.); *FTC v. Centurion Fin. Benefits LLC*, No. 05 C 5442 (N.D. Ill. Sept. 21, 2005) (Nordberg, J.); *FTC v. 3R Bancorp*, No. 04 C 7177 (N.D. Ill. Nov. 17, 2004) (Lefkow, J.); *FTC v. 120194 Canada Ltd.*, No. 04 C 7204 (N.D. Ill. Nov. 8, 2004) (Gottschall, J.); *FTC v. AVS Mktg., Inc.*, No. 04 C 6915 (N.D. Ill. Oct. 28, 2004) (Moran, J.); *FTC v. 9094-5114 Quebec Inc.*, No. 03 C 7486 (N.D. Ill. Oct 23, 2003) (Leinenweber, J.); *FTC v. Datatech Communications, Inc.*, No. 03 C 6249 (N.D. Ill. Sept. 8, 2003) (Lefkow, J.) (*ex parte* TRO entered by St. Eve, J., as emergency judge); *FTC v. STF Group, Inc.*, No. 03 C 977 (N.D. Ill. Feb. 12, 2003) (Zagel, J.); *FTC v. CSCT, Inc.*, No. 03 C 880 (N.D. Ill. Feb. 11, 2003) (Coar, J.); *FTC v. 1492828 Ontario Inc.*, 02 C 7456 (N.D. Ill. Oct. 17, 2002) (Guzman, J.).